FILED

2014 Oct-14  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **JASMINDA LOWE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | Civil Action Number |
| **CARDINAL HEALTH INC.,** | ) | **2:13-CV-00833-AKK** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

Jasminda Lowe pursues this claim against Cardinal Health Inc. for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Title VII), and under Alabama law for invasion of privacy and negligent and/or wanton training, supervision, and/or retention. Doc. 1 at 1. Lowe contends that Cardinal Health discharged her because she rebuffed the alleged sexual advances of her supervisor, Ralph Ruggs, and that Ruggs had direct input into the majority of the disciplinary actions that led to her discharge. *Id*. at 7. Cardinal Health moves for summary judgment on all of Lowe's claims, doc. 28, and the motion is fully briefed and ripe for review, docs. 28, 34, and 36. Based on a review of the evidence and the law, the court finds that genuine material factual

disputes exist regarding whether the alleged sexual harassment resulted in a tangible job detriment and whether a causal link exists between Lowe's protected activity and her discharge that precludes summary judgment on her sexual harassment and retaliation claims. However, summary judgment is due on Lowe's invasion of privacy and negligent and/or wanton supervision, training, and/or retention claims because Ruggs's alleged behavior does not entitle Lowe to recovery and because Lowe has not established that Cardinal Health failed to exercise due and proper diligence in response to Lowe's reports of sexual harassment. For these reasons, Cardinal Health's motion is due to be granted in part and denied in part.[1]

## I.  <u>SUMMARY JUDGEMENT STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as

---

[1] Cardinal Health also argues that the court should dismiss Lowe's complaint, because Lowe failed to amend the defendant's name from "Cardinal Health, Inc." to "Cardinal Health 200, LLC" after notification that she improperly named the defendant. Doc. 28 at 27. This issue is moot in light of Lowe's unopposed motion to correct misnomer of defendant, doc. 48.

Separately, Lowe also moves for sanctions against Cardinal Health for its alleged spoliation of evidence. Doc. 37 at 5–6. Spoliation is the "destruction of evidence or the significant and meaningful alteration of a document or instrument." *Green Leaf Nursery v. E.I. Dupont De Nemours and Co.*, 341 F.3d 1292, 1308 (11th Cir. 2008) (quotation marks omitted). Lowe argues that Cardinal Health  meaningfully altered and then destroyed surveillance video and destroyed quality and productivity records. Doc. 37 at 2–4. The court will carry this issue with the case to give the parties an opportunity to argue their respective positions.

to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the

disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II. <u>FACTUAL ALLEGATIONS</u>

The following facts reflect an assessment of the record in the light most favorable to Lowe. On May 23, 2011, Lowe began work at Cardinal Health as a warehouse associate. Doc. 1 at 3. In 2012, Ralph Ruggs became Lowe's direct supervisor. *Id*; doc. 28-1 at 9. As a warehouse associate, Lowe's responsibilities included taking and collecting, or "pulling," products from the shelves to organize customer orders. *Id*. at 8, 18.

The disciplinary steps that ultimately culminated in Lowe's discharge began on March 6, 2012, when Ruggs disciplined Lowe by placing her on

Coach and Counsel for "continued high error volume" and "continuous consumer complaints." *Id*. at 53. The form Ruggs prepared informed Lowe that "[f]ailure to improve upon these errors will result in discipline through the proper step progression, and may result in further corrective action including termination." *Id*. Coach and Counsel is the first step of Cardinal Health's disciplinary policy. The other three steps are: Step Two— Written Warning; Step Three— Final Warning; and Step Four— Termination. *Id*. at 52. Although it is intended as a progressive discipline policy, Cardinal Health may "bypass steps within the corrective action process depending on the seriousness of the nature of the offense." *Id*. at 53.

On May 15, 2012, Ruggs called Lowe and another employee into his office to discuss productivity rates. *Id.* at 14. During this meeting, Ruggs informed Lowe that she was not meeting the newly implemented productivity standards for the month of May,[2] and that she needed to improve her productivity rates or Cardinal Health would discharge her. *Id*.

---

[2] Lowe signed the Quality and Productivity Requirements for Inbound/Outbound Hourly Associates on March 15, 2012. Doc. 28-1 at 50. The requirements stated that employees "must not exceed two errors for items flagged hard to pick/pack," "errors resulting in a high inventory loss will be evaluated on a case by case basis and may be subject to corrective action," and employees should achieve an eighty-five percent monthly productivity rate. *Id*. at 51. Cardinal Health enacted this policy in 2012, and only expected associates to achieve a seventy-five percent productivity rate for the months of April and May. Doc. 28-3 at 23.

This discussion did not result in a write-up and, as a result, Lowe remained at step one of the four-step process.

The following day, Lowe contacted Cardinal Health's Advice and Counsel Center ("ACC")[3] and relayed to Martha Cotton that Ruggs threatened to discharge her because she had a "slow" rate of productivity. *Id*. at 14. Lowe also informed Cotton that Ruggs had asked her to stay in his hotel room during a company meeting, made frequent comments to her such as "you look so sexy," "you look so good," and "you smell sex," and that on one occasion Ruggs placed his hands on her shoulders when he commented, "you look so sexy." *Id*. at 10, 15. In addition, Lowe reported that Ruggs was involved in a romantic relationship with a subordinate, Afiya Burwell, who held the same position as Lowe. *Id*. at 15, 19.

Cardinal Health launched an investigation that consisted of Lori LeDuc, a Human Resources employee, Raul Valdez, Manager of Warehouse Operations, and Everett Posey, Director of Operations, interviewing Lowe, Ruggs, Burwell, and several other employees on May 17, 2012. Doc. 28-1 at 17–18. In their respective interviews Ruggs and Burwell denied being involved in a romantic relationship, and Ruggs denied any inappropriate conduct towards Lowe or Burwell. Doc. 28-2 at 14, 27. The focus of Lowe's

---

[3] The ACC is an ethics hotline that employees can use to report concerns about a violation of the ethics policy. Doc. 28-1 at 14, 48.

interview turned inevitably to her allegations concerning the alleged relationship between Ruggs and Burwell, with Posey and LeDuc asking her to disclose any information that she had regarding the alleged relationship. *Id*. at 31. Lowe also submitted a written statement after the interview. Doc. 28-1 at 57. A week later, Lowe contacted Posey and relayed that Burwell had told her that Burwell and Ruggs engaged in sex at work and that Ruggs had shown Burwell his penis during a one-on-one performance conversation. *Id*. at 20–21.

On May 29, 2012, Cardinal Health informed Lowe that it could not substantiate her allegations. *Id*. at 44. Additionally, to make matters worse for Lowe, the management team found that Lowe initially had withheld information about the alleged relationship between Burwell and Ruggs, by waiting until a week after her interview to disclose that Ruggs and Burwell had sex at work and that Ruggs showed Burwell his penis at work. *Id*. at 31. As a result, on June 6, 2012, Lowe received a Written Warning for "failing to be forthcoming and not providing pertinent information in a timely manner in an investigation." *Id*. at 54. This written warning advanced Lowe to Step Two of the disciplinary process. *Id*.

Apparently, Lowe was not the first employee to report the alleged relationship between Ruggs and Burwell. Prior to Lowe, Doug Brown had

informed Posey that Ruggs was engaged in a romantic relationship with Burwell. Doc. 28-2 at 11. Posey's investigation failed to substantiate the allegations.[4] *Id.* During the subsequent investigation of Lowe's allegations, Brown came forward with new information about the nature of the romantic relationship between Ruggs and Burwell. Doc. 47-10 *SEALED* at 1–3. In his statement, Brown explained that "[a]t one time, in a conversation with Everett Posey, I expressed concerns that something along the Burwell/Ruggs situation might be happening without directly stating that it was going on." *Id.* at 3. Brown's statement also contains information that could substantiate his allegations about Burwell and Ruggs's purported affair, which he appears not to have previously disclosed to Posey.[5] *Id.* at 1– 3.  However, unlike Lowe, Brown received no discipline for providing this additional information. *See generally* doc. 47-13 *SEALED* (Brown's personnel file).

A week after the written warning, Ruggs informed Lowe that she had failed to meet the required productivity rate for the month of May, and

---

[4] This investigation was in response to Brown and other employees' concern that Ruggs was showing favoritism toward Burwell regarding workplace benefits. Docs. 28-2 at 15; 47-14 *SEALED* at 3.

[5] Brown alleged that Burwell and Ruggs shared lunch in Ruggs's office, that Ruggs drove Burwell home from work, and that he overheard Burwell making explicit remarks in a telephone conversation, and that she may have been talking to Ruggs. Doc. 47-10 *SEALED* at 2.

issued her a Final Warning (Step Three) for having a low productivity rate.[6]
Doc. 28-1 at 12. Lowe's productivity rate was 72.7 percent for the month of
May. *Id.* at 55. The final warning meant Lowe's next discipline would result
in discharge.

The final infraction occurred a few weeks later, when, on July 3,
2012, Lowe approached Ruggs to inquire about an approved vacation
request that was omitted from the display board listing approved requests for
paid time off ("PTO"). *Id.* at 22. Lowe reminded Ruggs that Cardinal Health
approved her PTO on May 15, 2012, either told or screamed at Ruggs to "do
his job," and began to cry. *Id.* Ruggs responded "yeah, all the crap you
brought up . . . I'll do it for you, go away." *Id.* Although Lowe denies that
she yelled at Ruggs, *id.*, James Stubblefield and Danny Marshall, coworkers
who witnessed the incident, provided written statements at Ruggs's request
that stated, respectively, that Lowe "repeatedly raised her voice and
interrupted [Ruggs]," *id.* at 59, and that Marshall told Lowe to calm down,
*id.* at 58. Ruggs sent an email detailing the incident to Posey on July 5, in
which he included the Marshall and Stubblefield statements. Doc. 28-2 at
35–36.

---

[6] Lowe remained under Ruggs's supervision throughout the process. After she
reported Ruggs, Lowe testified that LeDuc asked her if she was "scared . . . [to] work
with [Ruggs]." Doc. 28-1 at 20. According to Lowe, LeDuc offered to place Lowe on a
different shift, but never followed through on the offer. *Id.*

After a review of Ruggs's reports and the statements Ruggs obtained, Posey and Valdez determined that Lowe's behavior violated Cardinal Health's standards of conduct. Doc. 28-1 at 56. Because Lowe previously had received three corrective actions, Posey and Valdez determined the next disciplinary step to take was discharge. Cardinal Health discharged Lowe upon her return from PTO on July 16, 2012. *Id.*

### III.  <u>ANALYSIS</u>

Lowe raises Title VII claims for sexual harassment and retaliation and state law tort claims. The court will begin with the sexual harassment claim, followed by the retaliation claim, and finally the state law claims.

*A.  Sexual Harassment*

Lowe contends that Ruggs sexually harassed her and took an adverse employment action against her after she rebuffed his sexual advances. Doc. 34 at 24–30. To establish a prima facie case of sexual harassment under Title VII a plaintiff must show that:

> (1) she belongs to a protected group; (2) she has been subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004)

(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 2004);

*Johnson v. Booker T. Washington Broad Serv.*, 234 F.3d 501, 508 n. 7 (11th

Cir. 2000)).  The Eleventh Circuit has referred to these elements as the

"*Mendoza* factors." *See*, *e.g.*, *Johnson*, 234 F.3d at 508 n. 7. Cardinal Health

contends that Lowe fails to meet her burden with regards to the fourth and

fifth *Mendoza* factors. Doc. 28 at 11–19. Cardinal Health's argument is ill–

founded, because it is premised on an overly narrow characterization of

Lowe's sexual harassment claim, i.e. that Lowe is only pursuing a hostile

work environment theory of liability.

There are two instances in which sexual harassment amounts to a Title

VII violation. The first is if the "employee's refusal to submit to a

supervisor's sexual demands results in a tangible employment action being

taken against her." *Hulsey*, 367 F.3d at 1245. A tangible employment action

is "'a significant hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant

change in benefits.'" *Id.* at 1245 (quoting *Burlington Indus., Inc. v. Ellerth*,

524 U.S. 742, 761 (1998)). "An employer is liable under Title VII if it (even

unknowingly) permits a supervisor to take a tangible employment action

against an employee because she refused to give in to his sexual overtures."

*Id*. Secondly, sexual harassment can constitute a Title VII violation "if it is sufficiently severe and pervasive to effectively result in a change . . . in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Id*. (citing *Burlington Indus.*, 524 U.S. at 754). Lowe's complaint and response to Cardinal Health's motion for summary judgment clearly indicate that she is alleging *both* a hostile work environment and a tangible employment action theory of recovery.[7] Doc. 34 at 25–28. Therefore, as shown below, focusing only on the severe and pervasive standard, as Cardinal Health suggests, would miss the mark on the tangible employment action claim.

As to Lowe's hostile work environment theory, in order to determine whether a working environment is "hostile" or "abusive," and consequently whether a plaintiff has established the fourth *Mendoza* factor—at least in the context of a hostile work environment theory—courts consider various factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

---

[7] This circuit's case law explicitly establishes that a plaintiff may pursue a sexual harassment claim based on both a hostile work environment and a tangible employment action theory of recovery, even if both theories are premised on the same underlying harassment. *See Hulsey*, 367 F.3d at 1246.

Construing the evidence in the light most favorable to Lowe, the court

agrees with Cardinal Health that Ruggs's alleged conduct is insufficiently

severe or pervasive to support recovery on a hostile work environment

theory. Lowe alleged that Ruggs stated on multiple occasions, "you look so

sexy" and "you smell sex," invited her to spend the night with him in a hotel

room, and touched her shoulders on one occasion and said, "you look so

sexy." Doc. 28-1 at 10, 15. With the exception of one time that Ruggs placed

his hands on Lowe's shoulders, Lowe does not contend that Ruggs touched

her inappropriately and she presented no evidence showing that Ruggs's

conduct was "physically threatening or humiliating" or that the cumulative

effect of this conduct "unreasonably interfered" with her job duties. *See

Harris*, 510 U.S. 17, 23. While the alleged conduct was inappropriate and

unwelcomed, it simply fails to reach the high threshold necessary in this

circuit to meet the severe and pervasive standard. By point of comparison, in

*Baldwin v. Blue Cross/Blue Shield of Ala.*, the court found that the following

conduct was not sufficiently severe or pervasive: a supervisor propositioning

an employee at a company banquet and on the drive home, asking her to

spend the night in his hotel room, cornering her in his office and

propositioning her by saying "hey, babe, blow me," approaching her on

more than one occasion and saying "hey, babe" while playing with his

13

zipper, and approaching her from behind two or three times and saying "hey, babe" while breathing down her neck. 480 F.3d 1287, 1302 (11th Cir. 2007). Lowe's allegations of a few remarks, one physical touch, and a single invitation to share a hotel room are even less severe and pervasive than the allegations in *Baldwin*.[8] Simply put, Ruggs's alleged misconduct fails to meet the severe or pervasive standard in light of this circuit's case law, and consequently cannot sustain a hostile work environment claim.

The court's analysis of Lowe's sexual harassment claim does not end here however, because, as explained above, Lowe also contends that Ruggs's sexual harassment led to her discharge. The Eleventh Circuit has clearly stated that district courts must evaluate Title VII liability according to the *Mendoza* factors regardless of whether a plaintiff premises employer liability on a tangible employment action theory or a hostile work environment theory. *See Johnson*, 234 F.3d at 508 n. 7 (stating that because the court "[s]ee[s] no important distinction between a prima facie case under quid pro quo as opposed to hostile environment claims, we will apply the *Mendoza* factors to [the plaintiff's] claims, irrespective of the terms 'quid

---

[8] For an additional point of comparison, see *Mendoza*, in which the court held the following conduct insufficiently severe and pervasive to sustain a Title VII claim: "(1) one instance in which [a supervisor] said to plaintiff, 'I'm getting fired up'; (2) one occasion in which [supervisor] rubbed his hip against [plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [supervisor] made a sniffing sound while looking at [the plaintiff's] groin area. . ." 195 F.3d 1238 (11th Cir. 1999).

pro quo' and 'hostile environment'"); *see also Pipkins v. City of Temple Terrace, Fla*., 267 F.3d 1197, 2000 (11th Cir. 2001) (noting that "[a]lthough the elements for a prima facie case for these two kinds of claims formerly were analyzed under slightly varying tests, this court has indicated a willingness to abandon the distinction") (citing *Johnson*, 234 F.3d at 508 n. 7). However, there is a crucial difference regarding the application of the fourth *Mendoza* factor, i.e. whether "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," *Hulsey*, 367 F.3d at 1244 (citing *Mendoza*, 195 F.3d at 1245), depending on whether a plaintiff is proceeding under a hostile work environment theory or a tangible employment action theory.[9] Under the tangible employment action theory, "if a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or pervasive.'"

---

[9] *Hulsey*, 367 F.3d at 1245–49, in which the plaintiff contended that the defendant was liable to her based on both theories, provides a good illustration of the difference between the application of the fourth *Mendoza* factor to a tangible employment action theory and its application to a hostile work environment theory. Only when analyzing liability on the hostile work environment theory did the court consider whether the wrongdoer's actions were of a frequency, degree, and nature that would qualify as 'severe and pervasive.' *Id*. Additionally, the Eleventh Circuit has described the difference between the two theories of liability as follows: "To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her. Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'" *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1231 (11th Cir. 2006).

*Johnson*, 234 F.3d at 508 n. 7. Consequently, when, as here, a plaintiff alleges liability for sexual harassment based on a tangible employment action theory, whether she satisfies the fourth and fifth *Mendoza* factor collapses into one inquiry: whether there is a basis for holding the employer liable because a supervisor took tangible employment action against the plaintiff for failing to comply with the supervisor's sexual demands. Whether the supervisor's alleged harassment was of a frequency, degree, and nature that would qualify as 'severe and pervasive'—as Cardinal Health contends Ruggs's does not—is irrelevant to the court's analysis of a tangible employment action claim.

Turning now to the specific contentions before the court, Cardinal Health argues that Lowe's alleged harassment did not result in a tangible employment action because Ruggs was not Lowe's supervisor since he did not have the authority to discharge her or participate in the decision to discharge her. Doc. 28 at 17. At a minimum, an issue of fact exists on the supervisory issue because Lowe contends, and the evidence (including Ruggs's warnings to Lowe about her production) supports Lowe's contention, that Ruggs had supervisory authority over her. Moreover, whether Ruggs lacked the authority to discharge or participate in the decision to discharge is not dispositive because, in this circuit, "a 'cat's paw'

theory of recovery may apply when a biased actor recommends that an

adverse employment action be taken against an employee, [even though] the

biased actor is not the ultimate decision-maker." *Williamson v. Adventist*

*Health Sys./Sunbelt. Inc.*, 372 F. App'x 936, 938 (11th Cir. 2010) (citing

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999)).

Furthermore, even if an:

> employer does attempt to confine decision[-]making power to a small
> number of individuals, those individuals will have a limited ability to
> exercise independent discretion when making decisions and will likely
> rely on other workers who actually interact with the affected
> employee. . . . Under those circumstances, the employer may be held
> to have effectively delegated the power to take tangible employment
> actions to the employees on whose recommendations it relies.

*Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2452 (2013). When viewed under

this framework, although Cardinal Health insists that Valdez and Posey

alone decided to discharge Lowe, a jury question exists because the record

indicates that they sought out Ruggs's opinion and assistance. *See* docs. 28-2

at 10–11 (describing the formal process used to investigate an employee who

curses at a supervisor, which includes gathering statements); 28-3 at 39, 41–

42 (explaining that Ruggs notified Posey of the incident via email and

gathered all of the witness statements in the formal investigation).

In addition to Ruggs's involvement in the incident that triggered the

discharge, Ruggs also played a role in the earlier disciplinary steps that

culminated ultimately in the discharge. These earlier disciplinary incidents that advanced Lowe to the next level show that the so-called decision-makers in the discharge had "a limited ability to exercise independent discretion . . . [that they] likely rel[ied] on other workers who interact[ed] with the affected employee . . . [and may] have effectively delegated the power to take tangible employement action . . . ." *Vance*, 133 S. Ct. at 2452. Ruggs's involvement in Lowe's discipline began on March 6, when Ruggs issued a Coach and Counsel notice to Lowe for "high error volume" and "continuous customer complaints." Doc. 28-1 at 53. Lowe made her complaint against Ruggs on May 16. Doc. 28-1 at 14. On June 5, Lowe received a Written Warning from Posey for initially withholding information about the alleged inappropriate relationship between Burwell and Ruggs when Lowe reported Ruggs on May 16.[10] *Id*. at 54. Six days after this discipline, Ruggs issued Lowe's Final Warning for alleged low productivity rates. *Id*. at 55. Following Lowe's alleged outburst, on July 3, Ruggs sent Posey an email detailing the event, and gathered statements from other employees about the incident, knowing that any discipline would result in Lowe's discharge. Docs. 28-3 at 41, 45; 28-2 at 35.  After Posey read

---

[10] Interestingly, although another employee also reported that Ruggs had a sexual relationship with Burwell, there is no indication from the record that Cardinal Health disciplined Ruggs. Rather, the only person disciplined was Lowe for purportedly withholding information about the alleged Ruggs/Burwell relationship.

Ruggs's email, Posey stated, "the termination was relatively cut and dry in my opinion," doc. 28-2 at 35, even though there is no indication he or anyone else in management ever directly spoke to the employees from whom Ruggs collected the statements. As the record plainly shows, without the earlier disciplinary write-ups issued by Ruggs, Lowe never would have advanced to the later steps, and without Ruggs's input and investigation into the July 3rd incident, Posey and Valdez would have had no cause to discharge Lowe. *Id*. In sum, there is evidence that Ruggs, at a minimum, played a role in three of the four disciplinary actions that culminated in Lowe's discharge. Therefore, whether Ruggs influenced Posey's and Valdez's decision based on discriminatory animus is a question for a jury.

In the final analysis, the record contains sufficient evidence to indicate that an issue of material fact exists as to whether Ruggs took an adverse employment action against Lowe or influenced the decision in a manner that could render Cardinal Health liable to Lowe. Consequently, Cardinal Health's motion on Lowe's sexual harassment claim is due to be denied.[11]

---

[11] Although Cardinal Health proffers a legitimate, nondiscriminatory reason for Lowe's termination, namely that she violated Cardinal's Standards of Conduct, and the record contains evidence supporting Cardinal Health's contention, in this circuit, the *McDonnell Douglas-Burdine* burden-shifting framework is not applicable to sexual harassment claims: "We are unwilling to read the *McDonnell Douglas-Burdine* framework into non-retaliation sexual harassment cases at this point. These types of cases have evolved quite separately from other Title VII cases, and applying a burden-shifting

## B. Retaliation

Lowe alleges that Cardinal Health discharged her in retaliation for reporting Ruggs's sexual harassment. Doc. 34 at 14–18. When evaluating a claim of retaliation under Title VII, in the absence of direct evidence, courts apply the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under this standard, the first step is for the plaintiff to establish a prima facie case, which in the retaliation context requires that "a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the subsequently materially adverse employment action." *Brush v. Sears Holding Corp.*, 466 F. App'x 781, 786 (11th Cir. 2012) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212 (11th Cir. 2008)). Cardinal Health challenges only the third prong, and contends that Lowe has failed to show that a causal link exists between her report of sexual harassment and her discharge. Doc. 28 at 22–23.

To satisfy the causation requirement, a plaintiff must produce evidence that the employer's "desire to retaliate" against the protected

---

analysis to them would be a departure from precedent." *Johnson*, 234 F.3d at 511 (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 n. 11 (11th Cir.1982)).

activity was the "but-for cause" of the adverse employment action. *Univ. of Tex. Sw. Med. Center v. Nassar*, 133 S. Ct. 2517, 2521 (2013). Additionally, the Supreme Court has held "if a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub v. Proctor Hosp*., 131 S. Ct. 1186, 1194 (2011). Also,"[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse action." *Adams v. City of Montgomery*, 569 F. App'x 769, 773 (11th Cir. 2014) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). "But mere temporal proximity, without more, must be 'very close.'" *Id*. (quoting *Thomas*, 506 F.3d at 1364). The Eleventh Circuit has provided little guidance regarding how much time must elapse between protected activity and an adverse action before temporal proximity, alone, is insufficient to establish causation, aside from remarking, several times, that "a three month interval between the protected expression and the employment action . . . is too long." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (citing *Thomas*, 506 F.3d at 1364); *see also Jiles v. United Parcel Serv., Inc.*, 360 F. App'x

61, 65–66 (11th Cir. 2010) (citing *Thomas*, 506 F.3d at 1364; *Higdon v. Jackson*, 393 F.3d 1211, 1220–21 (11th Cir. 2004)).

Here, the interval between the protected activity and the beginning of adverse action is much shorter than the three-month lapse rejected as insufficient by the Eleventh Circuit. Lowe engaged in protected activity when she reported Ruggs's harassment to Cardinal Health's ACC hotline on May 16, 2012. Doc. 28-1 at 14. Just three weeks later, on June 6, 2012, she received a written warning for failing to fully disclose her knowledge about Ruggs's relationship with Burwell during her initial interview with LeDuc and Posey. *Id*. at 54. Five days after that, Ruggs issued an additional warning to her for failing to meet production goals. *Id*. at 55. A month later, on July 16, 2012, after her confrontation with Ruggs, Cardinal Health discharged her. *Id*. at 56. In sum, beginning just three weeks after she engaged in protected activity, Lowe was subjected to three adverse employment actions over the course of two months: two warnings and, ultimately, discharge. The court finds that this temporal proximity is sufficient evidence of causation to satisfy Lowe's burden of establishing a prima facie case of retaliation.

Under the *McDonnell Douglas* framework, "the successful assertion of a prima facie case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Rioux v. City of Atlanta,* 520

F.3d 1269, 1275 (11th Cir. 2008) (citations omitted) (internal quotation marks omitted). The burden then shifts to the employer to produce evidence that it had a legitimate non-discriminatory reason for the challenged action. *Id*. Cardinal Health contends that Lowe's consistently low productivity rates, failure to be forthcoming in an investigation, and confrontation with Ruggs were the causes of its progressive disciplinary actions against Lowe, as well as the causes for its ultimate decision to discharge her. Doc. 28 at 21–22. These reasons are sufficient to satisfy Cardinal Health's burden. Consequently, the burden shifts back to Lowe to "show that the proffered reason really is a pretext for unlawful discrimination." *Rioux*, 520 F.3d at 1275 (citations omitted) (internal quotation marks omitted). To demonstrate pretext Lowe must show "that the employer's proffered reason [for her discharge] was false and that the true motive for the action was discriminatory." *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 914 (11th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 151 (1993)). "To survive summary judgment, [Lowe] need only show that a genuine issue of material fact in dispute could lead a rational trier of fact to make a finding of pretext." *Id.* (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024–25.

Based on a review of the record, there are at least two grounds for finding that the reasons articulated by Cardinal Health were pretextual. First,

as explained more thoroughly above, Ruggs, the alleged tortfeasor, played a crucial role in three of the four disciplinary actions that culminated in Lowe's discharge. Moreover, for the last two, he did so with the knowledge that Lowe had accused him of sexual harassment and after expressing resentment toward her and a desire for her to face consequences for her complaint against him. *See* Doc. 28-2 at 26–27 (Posey's testimony that when he interviewed Ruggs regarding Lowe's allegations, Ruggs became upset and said "What are you going to do with Jasminda. She is lying"; *see also* doc. 28-1 at 22 (Lowe's testimony that Ruggs referenced "all that crap you brought up" during their July 3, 2012 confrontation). Critically, Ruggs testified that, prior to reporting the July 3 confrontation between himself and Lowe, he knew that Lowe was on Final Warning and any additional disciplinary incident would result in her discharge. Doc. 28-3 at 45.

Second, the record contains evidence that Cardinal Health failed to discipline other employees who engaged in similar conduct as Lowe. "A typical means of establishing pretext is through comparator evidence." *Walker v. St. Joseph's/Candler Health Sys.*, 506 Fed. App'x. 886 (11th Cir. 2013) (citing *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001); *Sparks v. Pilot Freigh Carriers, Inc.*, 830 F.2d 1554, 1563 n. 20 (11th Cir. 1987)). Specifically, Cardinal Health issued a written warning to

Lowe on June 6, 2012 (advancing her to Step Two), when Posey and LeDuc

determined Lowe initially withheld information during their investigation of

the allegations she made in her May 16 telephone call to Cardinal Health

hotline because she subsequently provided additional information about the

alleged Ruggs/Burwell relationship. Docs. 28-1 at 54; 28-2 at 17. However,

when Brown, another warehouse associate, also provided additional

information about the same relationship, he was not disciplined. [12] *See*

*generally* doc. 47-13 *SEALED* (Brown's personnel file). Finally, although

Cardinal Health contends it ultimately discharged Lowe in response to her

July 3, 2012 altercation with Ruggs, Lowe testified that she witnessed

Burwell yelling and cursing at Ruggs on multiple occasions, and that

Cardinal Health never disciplined Burwell. Doc. 28-1 at 16–17. In addition,

Posey also stated that he had heard other employees cursing but did not

discipline them, and would not do so unless someone complained about the

language. Doc. 28-2 at 10. These discrepancies are sufficient for Lowe to

raise a jury issue.

---

[12] Brown also provided information regarding the alleged relationship between Ruggs and Burwell to Posey in 2012. Doc. 47-12 *SEALED* at 3. Brown followed up after his additional interview and provided additional information about the relationship. *Id.* In his May 17, 2012 statement, Brown states "[a]t one time, in a conversation with Everett Posey, I expressed concerns that something along the Burwell/Ruggs situation might be happening without directly stating that it was going on." *Id.* Cardinal Health did not discipline Brown for providing additional information. Doc. 47-13 *SEALED*.

In sum, Lowe has presented evidence that could lead a reasonable jury to conclude, if it is so inclined, that Cardinal Health's proffered reasons for her discharge were pretext for retaliation. As is often the case in the Title VII context, the resolution of Lowe's retaliation claim—and, indeed, her sexual harassment claim, hinges on whether the jury believes Lowe's version of events or that of the alleged tortfeasor, Ruggs. Because credibility determinations are the proper province of a jury, *see Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007), Cardinal Health's motion on Lowe's retaliation claim is also due to be denied.

## C. *Invasion of Privacy*

Lowe seems to contend that by asking her to spend the night with him at a hotel and touching her shoulders while saying "you look sexy," Ruggs committed the tort of invasion of privacy, for which Cardinal Health can be held vicariously liable. Doc. 1 at 10–11. Invasion of privacy is "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIssac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986). However, Alabama courts have consistently required allegations of egregious conduct to sustain a claim. *See id.* at 152 (noting that "[e]ven the dire affront of inviting an unwilling woman to illicit intercourse has been held by most

26

courts to be no such outrage as to lead to liability" for the tort of invasion of

privacy) (citing *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 124 (Ala.

1985); W. Prosser, *Law of Torts*, 54–55 (4th ed. 1971)). Specifically,

Alabama courts have generally required invasion of privacy claims to allege

both ongoing, persistent verbal harassment and unwanted physical contact.[13]

    In light of these stringent requirements, and in the absence of any

legal support for Lowe's contention, the court concludes that no reasonable

jury could find Ruggs liable for the tort of invasion of privacy based solely

on one inquiry to share a hotel room, a single incident of physical contact

and comments such as "you look sexy" and "you smell sex." Doc. 28-1 at 9–

10. Consequently, Cardinal Health's motion on the invasion of privacy claim

---

[13] *See, e.g.*, *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (substantial evidence supported lower court's finding that defendant committed invasion of privacy when the plaintiff presented evidence that the defendant repeatedly touched her in a manner that was unwelcome and with sexual overtones, "made several lewd comments[,] asked [the plaintiff] to meet him outside of work for other than business purposes[,] . . . [and] looked up [the plaintiff's] skirt on more than one occasion")); *Phillips v. Smalley Maint. Servs., Inc.,* 435 So. 2d 705, 711 (Ala. 1983) (finding that the facts of the case supported an invasion of privacy claim when the plaintiff testified that the defendant called her into his office, locked the door, and interrogated her about her sexual relationship with her husband, repeatedly demanded sexual favors from her, reacted violently when she refused, "[o]n one occasion struck her across the buttocks with his hand[, and o]n still another occasion, . . . began papering his office window, thus obscuring the view of those in the surrounding area, in pursuit of what he hoped would be the consummation of lurid propositions to [the p]laintiff"); *Cunningham v. Dabbs*, 703 So. 2d 979, 980–81, 982 (Ala. Civ. App. 1997) (finding that a reasonable jury could conclude the defendant intruded on the plaintiff's privacy when the uncontested evidence showed that the defendant "frequently rubbed [the plaintiff's] shoulders and repeatedly made lewd and suggestive comments to her, including suggestions that they have sex" and on one occasion "leaned over her as if he were going to whisper something to her and stuck his tongue in her ear").

is due to be granted. *See Alfa Life Ins. Corp. v. Jackson*, 906 So. 2d 143, 155 (Ala. 2005) (stating that "the dismissal of the tort claims against the agent . . . exonerated the principal . . . from liability for those alleged torts").

*D. Negligent/Wanton Training, Supervision, and/or Retention*

Finally, Lowe asserts that because Ruggs sexually harassed her and she experienced an adverse employment action after she reported the harassment, Cardinal Health was negligent and/or wanton in its training, supervision, and/or retention of Ruggs. Doc. 34 at 30. To establish this claim, a plaintiff must show that the employer:

> "(1) had actual knowledge[14] of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."

*Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999) (quoting *Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992)).

---

[14] Courts have been inconsistent with their scienter requirements for these causes of action. *See e.g.*, *Baldwin*, 480 F.3d at 1309 (citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999); *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970)) ("As to [the plaintiff's] negligence claims, she must show that Blue Cross had actual knowledge of Head's harassment and did nothing about it (for negligent retention) or would have known about the harassment had it exercised due and proper diligence (for negligent training and supervision."). A thorough discussion of the matter is unnecessary here because the disposition of Lowe's negligent/wanton training, supervision and/or retention claims hinges on whether Cardinal Health took adequate steps to remedy the situation.

Lowe has not presented any evidence that Cardinal Health could have known about the alleged sexual harassment prior to her report on May 16, 2012. Nonetheless, Lowe seems to argue that Cardinal Health is liable because it did not take adequate steps to investigate her report and failed to discipline Ruggs. The court disagrees because although Lowe received a copy of Cardinal Health's anti-harassment policy, she failed to report the sexual harassment at the time it occurred. Doc. 28-1 at 30. Moreover, when Lowe reported Ruggs on May 16, 2012, Cardinal Health promptly investigated the allegations—including obtaining written statements and conducting interviews. Docs. 28-1 at 31, 60–61; 28-2 at 31, 57. Ultimately, Cardinal Health was unable to substantiate Lowe's allegations, doc. 28-2 at 44, and, perhaps as a result, chose not to discipline Ruggs. The failure to discipline Ruggs, however, does not mean that Cardinal Health "did nothing about [the alleged harassment]." *Baldwin*, 480 F.3d at 1309; *see also Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2003) (citing EEOC Notice No. 915.002) (stating that, in the Title VII context "remedial measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur"); *Debord v. Mercy Health Sys. Of Kan., Inc.*, 737 F.3d 642, 654 (10th Cir. 2013) ("[C]orrective action does not always require discipline" of the

harasser.); *c.f. Mills v. Wex-Tex Indus.*, 991 F. Supp. 1370, 1390–91 (M.D. Ala. 1997) (denying the defendant's motion for summary judgment on the plaintiff's Alabama negligent/wanton retention claim because "[t]he facts establish[ed] that even after [the defendant] took some remedial measures, the harassing conduct continued"). The key inquiry, under these circumstances, is whether the alleged sexual harassment continued after Lowe's complaint and, from the record here, it did not. Consequently, Cardinal Health's motion for summary judgment on Lowe's negligent and/or wanton supervision, training and/or retention claim is due to be granted.

## IV.   **CONCLUSION**

For the reasons fully explained above, Cardinal Health's motion for summary judgment is due to be denied on the Title VII sexual harassment and retaliation claims and granted on the state law claims. The court will enter a separate order consistent with this opinion.

**DONE** the 14th day of October, 2014.

**ABDUL K. KALLON**
UNITED STATES DISTRICT
JUDGE